UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re    Scott D. Ryan,<br><br>            Debtor | Case No. 09-16182-jnf<br><br>Chapter  7 |
| SCOTT D. RYAN and<br>HEATHER A. RYAN,<br><br>Plaintiffs<br><br>v.<br><br>AMERICAN EDUCATION SERVICES, INC.; CMCA LLC; CITIGROUP, INC.; CITIBANK (SOUTH DAKOTA) NATIONAL ASSOCIATION; SLC STUDENT LOAN TRUST AND AFFILIATES; STUDENT LOAN CORP.; CITICORP CREDIT SERVICES, INC.; CITIBANK STUDENT LOANS; DELTA MANAGEMENT ASSOCIATES, INC.; EDUCATIONAL CREDIT MANAGEMENT CORPORATION; GREAT LAKES HIGHER EDUCATION CORP.; AL DEBOER AS CHAIR, BOARD OF TRUSTEES FOR HAMLINE UNIVERSITY OF MINNESOTA; KENTUCKY HIGHER EDUCATION STUDENT LOAN CORPORATION; KENTUCKY HIGHER EDUCATION ASSISTANCE AUTHORITY; KEYCORP; KEYBANK NATIONAL ASSOCIATION; NCO FINANCIAL SYSTEMS INC; NORTHSTAR EDUCATION FINANCE, INC.; TERRY W. GOODWIN AS CHAIR, BOARD OF TRUSTEES OF QUINNIPIAC UNIVERSITY; PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY; SALLIE MAE, INC.; SLM CORPORATION; STUDENT LOAN MARKETING ASSOC.; GREAT LAKES HIGHER EDUCATION CORP.; THE UNITED STATES OF AMERICA; WELLS FARGO EDUCATION FINANCIAL SERVICES; WELLS FARGO BANK, NATIONAL ASSOCIATION; WELLS FARGO & CO.,<br><br>Defendants | Adv. Proc. No. 10-_____ |

<u>VERIFIED COMPLAINT</u>

Pursuant to 11 U.S.C. § 523(a)(8) and Fed. R. Bankr. P. 7001(6)[1], the plaintiffs Scott D. and Heather A. Ryan seek hereby to discharge approximately $540,000 or more in student loan debt, the enormity of which creates an undue burden upon each of them and their four dependents Kitty, Liam, Fionn and Seamas.

I. <u>JURISDICTION</u>

1. This is a core proceeding as set forth at 28 U.S.C. § 157(b)(2)(I), over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a)-(b)(1) and 1334(b).

II. <u>PARTIES</u>

2. Mr. and Ms. Ryan are individuals married to one another and who reside with their four children at 8 Village Green Lane, Apartment No. 1, Natick, Massachusetts.

3. "American Education Services, Inc." is believed to be a fictitious name, under which Pennsylvania Higher Education Assistance Agency does business.

4. Citibank (South Dakota) National Association is a National Bank with a primary office at 701 East 60th Street, Sioux Falls, South Dakota, held by Citigroup, Inc., a New York bank holding company with a primary office at 399 Park Avenue, New York, New York.

5. The Student Loan Corporation is a Delaware corporation with an address at 750 Washington Boulevard, Stamford, Connecticut, and believed affiliated with both SLC Student Loan Trust and Citibank (South Dakota) National Association.

6. SLC Student Loan Trust is the name printed on invoices sent to the Ryans and the name of a trust or entity with a mailing address identical to that of The Student Loan

---

[1] Hereinafter, unless otherwise stated, all references to the "Code" section or chapter are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all references to "Rules" to the Federal Rules of Bankruptcy Procedure.

2

Corporation, from which the plaintiffs believes it reasonable to infer an affiliation sufficient for the trust to have received constructive notice of this action if indeed a proper party defendant.

7. Citicorp Credit Services, Inc. is a Delaware Corporation with a usual address of One Court Square, 25th Floor, Long Island City, New York.

8. Citibank Student Loans is believed to be a name under which either Citibank (South Dakota) National Association, The Student Loan Corporation, or both, may operate.

9. CMCA LLC is a New Hampshire limited liability company.

10. Delta Management Associates, Inc., is a Massachusetts Corporation with an address at 100 Everett Avenue, Suite 6, Chelsea, Massachusetts.

11. Educational Credit Management Corporation is a Minnesota corporation with an address of 1 Imation Place, Bldg 2, Oakdale, Minnesota.

12. Great Lakes Higher Education Corp. is a corporation with an office at 2401 International Lane, Madison, Wisconsin.

13. Hamline University is an educational facility with a campus at 1536 Hewitt Avenue, Saint Paul, Minnesota.

14. Kentucky Higher Education Student Loan Corporation has an address at 10180 Linn Station Road, Louisville, Kentucky, and is a statutory, municipal corporation and political subdivision of the Commonwealth of Kentucky under the auspices of the Kentucky Higher Education Assistance Authority, who has an address at Suite 102, 1050 U.S. 127 South, Frankfort, Kentucky.

15. Keybank National Association is a National Bank with an address of 127 Public Square, Cleveland, Ohio, held by Keycorp, a bank holding company with headquarters at the

same address.

16. NCO Financial Systems, Inc. is a Pennsylvania company with an address of 507 Prudential Road, Horsham, Pennsylvania.

17. Northstar Education Finance Inc. is a Delaware Corporation with a business address of 444 Cedar Street, Suite 800, St. Paul, Minnesota, and who operates The Higher Education Loan Program.

18. Pennsylvania Higher Education Assistance Agency is a holder and servicer of student loans, with an address at 1200 North Seventh Street, Harrisburg, Pennsylvania.

19. Quinnipiac University is an educational facility with a campus at 275 Mount Carmel Avenue, Hamden, Connecticut.

20. SLM Corporation is a Delaware corporation with an office at 12061 Bluemont Way, Reston, Virginia. SLM Corporation is, upon information and belief, the parent of Sallie Mae, Inc.

21. Sallie Mae, Inc. is a corporation with an office at 11600 Sallie Mae Drive, Reston, Virginia and a mailing address of PO Box 9500 Wilkes Barre, PA 18773.

22. Student Loan Marketing Association is believed to be the same entity as SLM Corporation.

23. The United States operates, among other things, by its Department of Education, with an office at 400 Maryland Avenue Southwest, Washington, District of Columbia.

24. Wells Fargo Education Financial Services is a division of Wells Fargo Bank, National Association, a National Bank with headquarters at 101 North Phillips Avenue, Sioux Falls, South Dakota, held by Wells Fargo and Company, a bank holding company with headquarters at 420 Montgomery Street, San Francisco, California.

4

III.    PROCEDURAL BACKGROUND

25. Scott Ryan held a permanent, full-time job when he and Heather commenced chapter 13 cases on June 30, 2009. Ms. Ryan's case bears docket number 09-16183-fjb. Their aggregate unsecured balances precluded a joint chapter 13 case.

26. Mr. Ryan became unemployed prior to his scheduled 341 meeting. Upon the debtors' motions, this Court converted their cases to proceed under Chapter 7.

27. This Court entered a general order of discharge in each of the Ryans' cases under section 727, on November 18, 2009, in Heather's and on November 27, 2009 in Scott's.

28. On January 19, 2010, this Court entered an order reopening Mr. Ryan's case.

29. Mr. and Ms. Ryan assert rights to relief under section 523(a)(8) with respect to the same occurrences, and questions of law and fact common to all defendants will arise in this proceeding. Therefore, they may be joined as plaintiffs in this adversary proceeding pursuant to Fed. R. Civ. P. 20(a), made applicable by rule 7020.

IV.    FACTS

30. The Ryans estimate that, at the time they filed their bankruptcy cases, their aggregate payment on account of the defendants' student loans came to approximately $6,000 a month (with an annual liability of approximately $72,000).

31. The Ryans financed the cost of their master of laws and law school degrees in the hope of a better life. But what Congress imagines the entry cost to lucrative careers has, for the Ryans, turned out to be a scourge of existence.

32. Since having started out in 2001 with so prized and costly an education, the Ryans have led a desperate search for income sufficient to provide nominal food, clothing and shelter.

33. The Ryans have not allowed their abject condition to frustrate their striving for better.

    They have moved several times for higher paying jobs and commuted up to 4 hours a day or more in order to sustain gainful employment. They have moved without savings and without reimbursement, typically arriving in their new location penniless and desperate for the first pay check to buy essentials.

34. Between 1991 and 1995, Mr. Ryan attended undergraduate school at Quinnipiac University in Hamden, Connecticut. Mr. Ryan lived on campus, worked part time during the school years and full time in the summers.

35. Prior to 1996, Ms. Ryan had completed and paid for an undergraduate degree in psychology. Then in 1996, she enrolled in the Hamline University program in paralegal studies in St. Paul, Minnesota. While obtaining her certificate, Ms. Ryan worked full-time and only borrowed what was necessary for tuition, covering all other costs herself.

36. Between 1996 and 1999, Mr. Ryan attended the Thomas M. Cooley Law School in Lansing, Michigan.

37. Between 1997 and 2000, Ms. Ryan attended the Hamline University School of Law.

38. The Ryans met in the master of laws program in taxation at Boston University, and they both received their master of laws degrees in 2001. At that time, the Ryans remained working in low-paying jobs unrelated to their education.

39. The Ryans could not afford test-preparation courses, and in July 2001, each took but neither passed the Massachusetts bar exam. At the time, Ms. Ryan was 3 months pregnant with the couple's first child. Neither had health insurance.

40. The Ryans took temporary positions in the fall of 2001 doing payroll audits. In early December, Mr. Ryan took a very low-paying, tax-related job with a non-profit agency. By the end of the month, the Ryans' first child, Kitty, was born.

6

41. At the time, the couple had no bed and slept on the floor. The apartment was infested with cockroaches, they could not afford to use heat in the apartment, and the baby's crib and all her clothes were second-hand. The couple received subsistence benefits under the Special Supplemental Nutrition Program for Women, Infants and Children, offered by the U.S. Department of Agriculture.

42. In the summer of 2002, Mr. Ryan tore his Achilles tendon for the second time and needed emergency surgery. As a result of his injury, he has chronic pain and cannot perform hard physical labor.

43. Toward the end of 2002, Mr. Ryan took a job with Thompson-West in Rochester, New York, paying approximately $35,000 annually. Over a year out of law school, this was the best opportunity the young family had seen, and they moved to Rochester.

44. In June 2003, Mr. and Ms. Ryan were married in a civil ceremony. Their only company was their daughter Kitty, then two years old. They could not afford a reception or a wedding band for Mr. Ryan. The couple has yet to have taken a honeymoon.

45. In September 2003, the couple's son Liam was born.

46. Some months later, to save money, the family moved into an apartment over a homeowner's garage, which eventually proved to leak carbon monoxide.

47. Despite substandard housing and constant other sacrifices, the family still could not afford to live in Rochester on Mr. Ryan's salary. Therefore, when in the spring of 2004, Ms. Ryan was offered what seemed a lucrative job as a legal recruiter in Boston, the couple believed that their circumstances would improve, and the family moved to Boston again.

48. Unfortunately, the commission-only recruiting job provided so little steady income that

Ms. Ryan instead had to take a temporary paralegal job, while she and Mr. Ryan continued to search for work.

49. Ms. Ryan's temporary position did not provide sufficient income for the family's necessaries, and the couple received food stamp benefits.

50. Poor creditworthiness related to the Ryans' enormous student loan debt has prevented the couple from locating housing, first in Rochester, then in Boston. While searching for employment in Boston, the young family lived at a Hampton Inn without a kitchen.

51. After five months without success in Boston, Heather again accepted a legal recruiting job, this one in New York, New York, with an annual salary of approximately $50,000. Four years out of law school, this was the best opportunity the couple had had.

52. The couple could not afford housing near New York City and lived with their children in one room of Mr. Ryan's sister's home in Monroe, New York. They then moved to a Hampton Inn, then finally to a dilapidated farm house two hours away from the city.

53. In the summer of 2005, the couple's third child, Fionn was born. At that time, Ms. Ryan had to reduce her hours to half time and work primarily from home.

54. In November 2005, Mr. Ryan had an interview at PriceWaterhouseCoopers ("PWC"). He did not own a suit and had to buy one for the purpose of his interview.

55. In December 2005, Mr. Ryan accepted a job as a tax consultant with PWC.

56. In December 2006, Seamas, the Ryans' fourth child, was born.

57. According to the prices quoted by telephone and literature available through the Natick public school system, the Ryans estimate that full time child care would cost between $3,303 and $3,440 per month and part time between $2,838 and $2,942.

58. Assuming that one Ryan parent can earn enough income from employment to keep the

8

family at a subsistence level, the Ryans are without reasonable expectation that the other parent will likewise obtain income that exceeds the cost of child care at all, and certainly not by a margin sufficient to justify depriving their children of the superior nurturing that their own mother continues to provide.

59. At all times, including the few years with Thompson West and with PWC, the Ryans' dutiful payment on their student loans have consistently prevented them from what has been needed for existence.

60. Despite their persistent misfortune, the Ryans estimate that they have paid between approximately $15,000 and $20,000 to the defendants through the years.

61. The family has often required subsidies for food, lived without furniture, often without heat in the winter and without hot water. The couple has had to warm water on the stove to bathe their children.

62. Ms. Ryan has not been out for dinner, with her husband, since before their first child was born in 2001.

63. Ms. Ryan and her husband have never been to a movie theatre together.

64. Neither the Ryans nor their children have ever taken a vacation, not as a couple and not as a family.

65. Their clothing is primarily second-hand, their furniture found discarded by others.

66. The Ryans cannot afford to host other children at parties and, therefore, have not allowed their children to have birthday parties.

67. The Ryans' children cannot participate in after-school or extracurricular activities, because they cannot afford the costs.

68. The Ryans cannot participate with their children in many school-sponsored events, such

9

as pancake breakfasts or ice cream socials, because they cannot afford the admission fees.

69. The Ryans' four children share one room and sleep in toddler bunks that are dilapidated.

70. The Ryans cut their children's hair themselves.

71. Mr. Ryan suffers from anxiety and takes medication as a result.

72. Ms. Ryan and her husband both suffer from chronic hypertension and take medications.

73. The Ryans' son Liam suffers from severe plaque psoriasis that requires expensive prescription treatments.

74. The Ryans cannot always afford the medications that they need.

75. The Ryans are currently behind in making medical co-payments for claims incurred post petition.

76. The Ryans' bankruptcy cases were precipitated by state court Supplementary Process rulings, CMCA, LLC v. Ryan, No. 200987SP000016 (Dist. Ct. Mass. (Natick) filed Feb. 26, 2009), in favor of the educational creditor, including an order on April 8, 2009, that Ms. Ryan pay $100 per week to the judgment holder.

77. Even if they obtained their licenses to practice, the Ryans remain undesirable as law firm associates because they are ten years out of law school and without experience.

78. Their law degrees have not enabled even subsistence careers for the Ryans, and the longer they remain without resultant employment, the less likely they will benefit from having law degrees.

79. Mr. Ryan has not returned to full-time employment since he lost his job in the summer of 2009. The Ryans, therefore, presently subsist upon unemployment benefits, food stamps and local food pantries.

80. More than Mr. or Ms. Ryan, who are adults and can accept the full consequences, their

children have suffered, suffer presently and will remain suffering as a result of their parents' destitution.

81. The Ryans cannot afford the monthly payments for the defendants' claims.

82. Without discharge, as soon as this proceeding concludes, the Ryans will be in default on loans totaling an estimated $540,000 or more, subject to law suits, wage garnishments and the plethora of available collection methods.

83. Without discharge, the Ryans and their four minor children will suffer the inability to make approximately $6,000 per month payments and the crushing degradation and emotional distress of law suits and unfettered creditor harassments.

84. The Ryans have applied for relief under the William D. Ford Direct Loan repayment program.

85. Repeatedly, representatives at the program have advised Ms. Ryan (for reasons that remain unclear) that her default makes her ineligible for the program. The representatives have refused to send her an application. Upon advice of her counsel, she used a duplicate of the application sent her husband and applied nonetheless.

86. The program has not responded.

87. The program's entire response to Mr. Ryan's application was an offer that he pay $52 per month on account of a solitary loan with a $1,474 balance.

COUNT I    DISCHARGE PURSUANT TO 11 U.S.C. § 523(a)(8)

88. The Ryans adopts by reference all allegations set forth in paragraphs one through 87, above.

89. The Ryans' household income does not enable them to satisfy their aggregate monthly payments on account of the defendants' loans.

11

90. The inability of the Ryans' household to satisfy the aggregate due each month on account of student loans will force them to make payments to some creditors at the expense of others, just as had been necessary before their bankruptcy cases.

91. Paying one creditor at the expense of another will create an unfair "race to the courthouse" in contravention of federal bankruptcy policies.

92. The Ryans can be ordered but cannot be forced to pay the defendants' claims: they lack the resources. The household income does not enable them to make any monthly payments to the defendants.

93. If the Ryans cannot discharge but must repay the defendants' loans, neither they nor their dependants will be able to maintain a minimal standard of living, despite their recent discharge of other unsecured debt.

94. Their present inability to make the defendants' required payments enables this Court to discharge the Ryans' student loan debts.

95. The circumstances creating the Ryans' historic and present inability to make payments on account of the defendants' claims will likely persist.

96. The Ryans' inability to obtain employment resulting from their education places their circumstances beyond those imagined by Congress in justifying the exception it made for discharging student loans.

97. Despite their circumstances, the Ryans have made a good faith effort to repay their student loans.

98. Excepting the defendants' loans from the Ryans' general discharge, therefore, will impose undue hardship upon the Ryans and their four dependents, and this Court must enter an order discharging the debt.

COUNT II     DISCHARGE PURSUANT TO
STATE AND FEDERAL LOAN REGULATIONS

99. The Ryans adopt by reference all allegations set forth in paragraphs one through 98, above.

100.   The defendants may have failed to observe certain state and federal statutes regulating lending to consumers.

101.   To the extent that state and federal laws so provide, the Court should enter an order rescinding the contracts underlying the defendants' loans where applicable.

COUNT III     LOAN REVISION

102.   The Ryans adopt by reference all allegations set forth in paragraphs one through 101, above.

103.   The Ryans believe that the enormous and unmanageable balance of their student loans, the policies of federal bankruptcy relief, the language of the statute, the quantity of their dependents and resultant hardship requires a full discharge of the defendants' loans.

104.   The Ryans do not believe that section 523(a)(8) designates this Court as a "work out specialist."

105.   Mindful, however, of the obstacle that our representative body in Congress has seen fit to place before so reasonable a request as Ms. Ryan's, if this Court will not discharge the defendants' loans, the Ryans asks in the alternative that this Court enter an order restructuring payments to reasonable, income-contingent and eventual balance-forgiving terms.

WHEREFORE, the Ryans request that this Court enter an order:

   i)      Declaring the defendants' general unsecured, non-priority claims discharged as an undue hardship pursuant to 11 U.S.C. § 523(a)(8); or

ii) Rescinding the contracts underlying the defendants' claims; or

iii) Restructuring the payments on account of the defendants' loans to reasonable terms as specified herein; and

iv) Granting as much other and further relief as justice may require.

SCOTT D. RYAN
HEATHER A. RYAN

by Their counsel

January 22, 2010

/s/ Taylor A. Greene
Taylor A. Greene (BBO # 645939)
220 N. Main Street
Natick, MA 01760
(508) 652-0004
tg@taylorgreenelaw.com

## VERIFICATION

We, Scott D. Ryan and Heather A. Ryan, are citizens of the United States and residents of the Commonwealth of Massachusetts, have read the foregoing Complaint and, pursuant to 28 U.S.C. § 1746, hereby declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated this 22nd day of January, 2010

/s/ Scott D. Ryan                              /s/ Heather A. Ryan